1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    HARPREET SINGH,                          Case No.  2:24-cv-2003-DAD-JDP (P)

12                    Petitioner,

13          v.                                  ORDER; FINDINGS AND
                                                RECOMMENDATIONS
14    EDWARD BORLA,

15                    Respondent.

16

17          Petitioner Harpreet Singh, represented by counsel, seeks a writ of habeas corpus under 28

18    U.S.C. § 2254.  ECF No. 1.  He brings a single claim of instructional error, alleging that the trial

19    court erred when it failed to *sua sponte* instruct the jury on an essential element of the crime with

20    which he was charged.  *Id.* at 9.  Respondent has filed an answer, ECF No. 11, arguing that the

21    claim should be denied, and petitioner has filed a traverse, ECF No. 12.  Petitioner has also filed a

22    motion for prompt issuance of findings and recommendations.  ECF No. 13.  After reviewing the

23    pleadings, I recommend that petitioner's claim be denied.  In light of the issuance of these

24    findings and recommendations, I deny petitioner's motion for prompt issuance of the same.

25
26
27
28
                                                1

**Background**

I have reviewed the background summary provided by the state appellate court on direct appeal.  I find it to be correct and reproduce it here:

A.  The Sexual Assault

M.D. and defendant had been dating for about a month in July 2016.  He had told M.D. he was once accused of rape.

According to M.D., on July 5, 2016, at around 2:00 a.m., she went to defendant's Elk Grove home to spend time with him and talk about their relationship.  An engagement party for defendant's brother was ending; when she arrived, someone offered her a drink and she accepted.  She and the others socialized and drank.  At some point, defendant asked her to go upstairs after she started feeling dizzy and wanted to go outside.

When they got upstairs, M.D. took off some of her clothes and they started kissing on defendant's bed.  She was not going to have sex with defendant that night because she was menstruating and M.D. believed defendant had sex with other women during a recent trip to Las Vegas.  Defendant touched her vagina; she told him to stop and pushed defendant away.  He did not comply at first, but he eventually let her use the bathroom.  He was asleep when she returned.

M.D. was upset because she had come over to defendant's to talk with him, so she tried to wake defendant by kissing and moving him.  Defendant muttered another woman's name when he awoke, which upset M.D.  She and defendant started to wrestle, playfully at first until defendant grabbed her wrists and pushed M.D. onto the bed.  An angry looking defendant pinned her arms above her head and threatened, "I will fuck you up, nigga."  Scared, M.D. tried but failed to get away from defendant.  He removed her remaining clothing while ignoring M.D.'s repeated pleas for him to stop.  According to M.D., she tried to push defendant away but he penetrated her vagina with his penis three to four times.  Still angry, defendant slapped M.D. in the face and called her a "dirty bitch."

M.D. could do no more than turn her body around as she tried to get away from defendant.  He started pulling M.D.'s hair, then put something into her anus several times.  After M.D. got on her back, defendant started to choke her.  He laid down on the bed after he stopped the assault.

M.D. cried and pounded on defendant's chest.  Defendant went to her side and apologized but got angry when she refused to calm down.  He told M.D. she should calm down or leave.  Being too intoxicated to drive and unable to find a ride home, M.D. slept in defendant's bed.

2

At 9:00 a.m. that morning, defendant told M.D. to get dressed while he confirmed that his parents were not home.  After she left, defendant sent M.D. a text thanking her for coming over.  M.D. replied by texting defendant that he was a "fucking psycho" who put his hands on her.  Later that day, she texted her friends that she fought with defendant because he wanted to have sex and she did not.  She also texted her friends that defendant had "slapped" her a few times, had pulled her hair, scared her, and acted like a "fucking psycho."  She told them that she had to do "the hardest thing," sleeping at his house that night, because she could not find a ride home.

M.D. reported the sexual assault to the Elk Grove Police that afternoon.  Police Officer Jason Skelton interviewed her and saw a bruise on her left forearm, where she reported feeling pain.  M.D. also complained of pain in her neck, but Officer Skelton saw no marks.  She told Officer Skelton she was on her period, had removed one tampon, and inserted another.

M.D. had a sexual assault examination that day, during which she told Dr. Angela Vickers that defendant had penetrated her anus with his finger.  Dr. Vickers found evidence of anal tears, several cuts to M.D.'s inner vagina, and that two tampons were in her vagina.  No semen was found in swabs taken from her vulva, vagina, cervix, or the tampons.

Swabs taken from both sides of M.D.'s neck contained DNA that was consistent with defendant's.  DNA from her right breast had a profile that was highly likely defendant's.

In a later interview with Elk Grove Police, M.D. said defendant penetrated her vagina and anus with his finger while her hair was being pulled.  The penetration of her vagina began before the "playful wrestling" started.

B.  Kidnapping and Dissuading a Witness

On October 23, 2017, a week before defendant's trial was scheduled to start, a man and a woman approached M.D. as she got out of her car by her apartment.  The man yelled at M.D.; he pointed a gun at her head as she turned around.  The man grabbed M.D.'s arm, told her to shut up, and pushed her into a car that was driven by a third person.  Inside the car, the woman, Jaswin Kaur,[1] told M.D. that defendant had sent them.  Kaur said they had been following her for a year, knew where she worked, and where her daughter went to school; they knew her every move.  M.D. was scared when Kaur told her the name of her daughter's daycare, the store where she worked, and the gym she used.

---

[1] [footnote two in original text] Kaur and defendant filed for a marriage license on June 20, 2017.

Kaur told M.D. testifying against the defendant was wrong because he was innocent.  She told M.D. not to appear in court.  M.D. was to contact a defense investigator, Angela Santos, the following day and recant the allegations she made against defendant.  M.D., who believed she was being recorded, was made to repeat statements to the effect that no sexual assault took place.  Kaur told M.D. defendant wanted to contact her and would contact her the next day about arranging a meeting.  The kidnappers then drove back to M.D.'s apartment and dropped her off.

M.D. stayed home from work the following day.  She called Investigator Santos and left a message to call back.  She then went to the store, where Kaur called and told M.D. she knew where she was and that she should call Kaur after talking with Santos.  Santos later called, and M.D. gave a recorded statement recanting her allegations against defendant.  She then called Kaur and related what she told Santos.

That evening, M.D. talked on the phone with defendant, who said he was frustrated with the case and how much money he spent on it.  They agreed to meet at a park near M.D.'s apartment and did so the next day.  When they met, defendant hugged and caressed M.D., searched her for a wire, and told her everything would be all right.  After defendant again vented about his situation and his belief that the sexual assault never happened, M.D. expressed her sympathy because she felt she had to.  Defendant said nothing would happen to M.D. if she did not show up to testify, and she would get a paid vacation for herself and her daughter if this happened.  He also told M.D. the case would be dropped if she did not show up.  After defendant made sexual advances towards her, M.D. became uncomfortable and thought up a reason to leave.

The next day, October 26, 2017, M.D. drove to Fairfield to see a friend.  Kaur repeatedly called her that day, but M.D. ignored the calls.  The following day, October 27,2017, Kaur texted M.D. to call her back.  When she did so, Kaur told M.D. she was upset, M.D. should answer her calls, and that she knew M.D. had gone to Fairfield.  M.D. wondered whether she was being followed.  On October 28, 2017, M.D. looked under her car and found what was later identified as a GPS tracker.  This caused M.D. to decide to testify at defendant's trial.  She called the Elk Grove Police and gave an initial statement, and later spoke with a detective, who told her the device was a GPS tracker, which police eventually recovered.

M.D. gave an extensive statement to the Elk Grove Police on October 29, 2017, after which she participated in four pretext calls, two with Kaur, and two with defendant.  During one call, defendant complain[ed] [or sic] he would get 40 years for something he did not do.  He told M.D. he was in charge and in control of the situation, the tracker had been on M.D.'s car for a while, and nothing would happen to her if she listened to him.  In the other pretext call, defendant told M.D. that she was being tracked only so the case would drop, he had control of the situation but would lose it if M.D. did not listen, and her doing something stupid would

"fuck you up." Kaur told M.D. in one call that "he" had asked her to call M.D., they had been tracking her for about a year and would continue until the entire trial was dropped. Kaur also told M.D. nothing would happen to her or her daughter if the case was dropped, and they could have taken care of the problem, but "he" did not want to do that.

Defendant was arrested after the pretext calls. Elk Grove Police seized six cell phones from defendant's truck when executing a search warrant. In a call from jail with a woman named Jas, defendant told the woman to turn off her phone and the woman told defendant she had no money and could not book a ticket to India. About a week later, he made a call to a phone linked to Kaur, the two engaged in a highly emotional conversation during which they each expressed their love for the other.

C. Prior Misconduct

On April 23, 2010, D.D. met defendant at a friend's barbecue. She did not feel well after a few drinks while at the barbecue and went to a guest bedroom to sleep. D.D. awakened to find defendant on top of her; he was pinning her arms down and his face was very close to hers. Defendant had removed her pants and underwear, and his penis was inside her vagina. A hysterical D.D. scratched defendant's face and kicked him as she tried to escape. Defendant kept thrusting his penis into her vagina. When she escaped, D.D. left the bedroom and sought help.

D. Defense Evidence

Officer Skelton took M.D.'s statement and asked whether she resisted defendant taking off her bodysuit. M.D. told the officer she did not say no to the defendant because she thought he was trying to make her feel comfortable.

Heath Newland, defendant's friend, and a former employee of the towing business owned by defendant's family, attended the July 4 and 5, 2016 gathering at defendant's home, which followed an engagement party for defendant's brother. Newland testified that M.D. arrived at the gathering around 1:30 a.m.; she was nicely dressed and looked "hot." She sat next to defendant on the couch, held his hand, and was very flirtatious with defendant. Newland saw M.D. have two drinks.[2] After he went to bed in a guest bedroom, Newland was awakened by defendant a little after 4:00 a.m. He went upstairs to defendant's bedroom, where he saw M.D. sitting on defendant's bed, looking like she just had sex. M.D. declined his offer of a ride home. He admitted to previously stating M.D. looked like she had been crying.

---

[2] [footnote three in original text] Newland also saw defendant drink that day, "normally for a party of that caliber;" but he did not think defendant was drunk or "sloppy drunk," but maybe "buzzed."

> Dr. Jerrold Kram, an expert on sleep medicine, testified about the sleep disorder parasomnia, a condition where the subject engages in various activities like going downstairs, cooking and eating, and then returning to bed, without remembering having done so. Alcohol can contribute to the deep sleep state during which this can occur.
>
> Ashley Cuevas met defendant at the end of 2014 and dated him for around six months. They had sex during this time; defendant never forced her to engage in any sexual activity, even when they had sex after drinking alcohol. She continued the relationship after defendant told her he had been convicted of rape.

ECF No. 9-16 at 3-8.

## Discussion

### I.    Legal Standards

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*, 621 F.3d 970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) ("Because the California Supreme Court denied review of Gill's habeas petition without comment, we look through the unexplained California Supreme Court decision to the last reasoned decision . . . as the basis for the state court's judgment.") (internal quotations omitted).

Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if the state court's adjudication resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## II.   **Analysis**

As noted above, petitioner raises only an issue of instructional error, namely that the trial court erred when it failed to instruct on the specific intent required to commit assault with intent to commit sexual penetration by force. ECF No. 1 at 9. The state appellate court rejected this claim on direct appeal:

> Defendant contends the trial court prejudicially erred in failing to adequately instruct on the specific intent element of the section 220 offense of assault with intent to commit sexual penetration by force, and by failing to instruct on voluntary intoxication and unreasonable belief M.D. consented to the penetration.
>
> A. Background
>
> Regarding the sexual assault of M.D., defendant was charged with rape (§ 261, subd. (a)(2)) in count one and forcible sexual penetration (§ 289, subd. (a)(1)) in counts two and three. He was acquitted of the charge and the lesser included offense on count one, acquitted on count two, with the jury unable to reach a verdict on the lesser included offense, and acquitted on count three, but convicted of assault with intent to commit sexual penetration as a lesser included offense.
>
> Over the prosecutor's objection, the trial court ruled that the jury would be instructed on the rape and forcible sexual penetration charges that defendant was not guilty if he actually and reasonably believed M.D. consented. Over defendant's objection, the trial court also gave a pinpoint instruction that such belief could not be reasonable unless supported by circumstances other than voluntary intoxication. The trial court further ruled the reasonable belief in consent instruction was inapplicable to the lesser included offense of assault with intent to commit sexual penetration because this charge alleged conduct to which M.D. could not consent. Defense counsel agreed with this ruling.
>
> The trial court gave the standard jury charge on assault with intent to commit sexual penetration by force, CALCRIM No. 890 as follows:
>
> "Assault with intent to commit a sexual penetration by force, in violation of Penal Code section 220, is a lesser offense of sexual penetration by force charged in Counts 2 and 3.
>
> "To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant did an act that by its nature would directly and probably result in the application of force to a person;

"2. The defendant did that act willfully;

"3. When the defendant acted, he/[she] was aware of facts that would lead a reasonable person to realize that his/[her] act by its nature would directly and probably result in the application of force to someone;

"4. When the defendant acted, he/[she] had the present ability to apply force to a person;

"[AND]

"5. When the defendant acted, he/[she] intended to commit sexual penetration by force.

"Someone commits an act willfully when he or she does it willingly or on purpose.

"The terms application of force and apply force mean to touch in a harmful or offensive manner.  The slightest touching can be enough if it is done in a rude or angry way.  Making contact with another person, including through his or her clothing, is enough.  The touching does not have to cause pain or injury of any kind.

"The touching can be done indirectly by causing an object to touch the other person.

"The People are not required to prove that the defendant actually touched someone.

"No one needs to actually have been injured by the defendant's act.  But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault, and if so, what kind of assault it was.

"To decide if defendant intended to commit a sexual penetration by force please refer to Instruction 1045 which defines that crime."

The court instructed on the sexual penetration by force charges in counts two and three with CALCRIM No. 1045, which stated as follows:

"The defendant is charged [in Count] with sexual penetration by force in violation of Penal Code section 289.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant committed an act of sexual penetration with another person;

8

"2. The penetration was accomplished by using a foreign object, or an unknown object;

"3. The other person did not consent to the act;

"AND

"4. The defendant accomplished the act: 'by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person.

"*Sexual penetration* means penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal, or gratification.

"*A foreign object, substance, instrument, or device* includes any part of the body except a sexual organ. An unknown object includes any foreign object, substance, instrument, or device, or any part of the body, including a penis, if it is not known what object penetrated the opening.

"Penetration for *sexual abuse* means penetration for the purpose of causing pain, injury, or discomfort.

"In order to *consent*, a person must act freely and voluntarily and know the nature of the act.

"Evidence that the defendant and the other person dated is not enough by itself to constitute consent.

"An act is accomplished by force if a person uses enough physical force to overcome the other person's will.

"*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.

"*Retribution* is a form of payback or revenge.

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"An act is *accomplished by fear* if the other person is actually and reasonably afraid.

"The defendant is not guilty of forcible sexual penetration if he/[she] actually and reasonably believed that the woman consented to the sexual penetration and actually and reasonably believed that she consented throughout the act of sexual penetration. However, if as a result of self-induced intoxication, the defendant believed the female was consenting, that belief would not thereby become either

9

reasonable or in good faith unless from all the surrounding circumstances other than self-induced intoxication you should find that defendant's belief that the female was consenting was reasonable and in good faith. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty."

B. Intent and Consent

Defendant's primary claim of error is that the trial court erred by failing to instruct on the section 220 offense element of specific intent.

A trial court has a sua sponte duty to instruct the jury on the essential elements of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 480, 76 Cal. Rptr. 2d 180, 957 P.2d 869), and on the general principles of law governing the case, which include those principles of law closely and openly connected with the facts of the case and necessary to the jury's understanding of the case. (*People v. Michaels* (2002) 28 Cal.4th 486, 529-530, 122 Cal. Rptr. 2d 285, 49 P.3d 1032.) "A 'criminal defendant is entitled to adequate instructions on the defense theory of the case' if supported by the law and evidence. [Citation.]" (*People v. Bell* (2009) 179 Cal.App.4th 428, 434, 102 Cal. Rptr. 3d 300.)

On appeal, we review the wording of a jury instruction de novo and determine whether the instructions are complete and correctly state the law. (*People v. Bell, supra*, 179 Cal.App.4th at p. 435.) We examine the entire charge of the court to determine whether the instructions are adequate, and whether it is reasonably likely that the instructions as a whole caused the jury to misapply the law. (*People v. Cain* (1995) 10 Cal.4th 1, 36, 40 Cal. Rptr. 2d 481, 892 P.2d 1224.)

Defendant notes that section 220, by requiring an intent to do some further act or achieve an additional consequence, is a specific intent crime. (*People v. Rathert* (2000) 24 Cal.4th 200, 205, 99 Cal. Rptr. 2d 779, 6 P.3d 700 [defining specific intent]; *People v. Dixon* (1999) 75 Cal.App.4th 935, 942, 89 Cal. Rptr. 2d 602 [mens rea of section 220].) He further notes that in a prosecution for forcible sexual penetration (§ 289, subd. (a)(1)), the prosecution must prove the act was without the victim's consent, but it does not have to prove that the defendant intended to have sex against the victim's will. By contrast, an essential element of section 220 "'is the intent to commit the act against the will of the complainant.'" (*People v. Davis* (1995) 10 Cal.4th 463, 509, 41 Cal. Rptr. 2d 826, 896 P.2d 119.) From this, defendant concludes the instruction on the section 220 offense was insufficient because the jury was not instructed that defendant had to intend to penetrate M.D. without her consent.

*People v. Dillon* (2009) 174 Cal.App.4th 1367, 95 Cal. Rptr. 3d 449 (*Dillon*) rejected a claim similar to that made here. The codefendant in *Dillon*, Hall, was convicted of assault with the intent

to commit rape by a foreign object (*id.* at p. 1369) and claimed CALCRIM No. 890 was insufficient because it failed to specify that the prosecution had the burden of proving a lack of consent (*id.* at p. 1378). The *Dillon* court noted that section 220 required "not only the specific intent to commit the underlying sexual act, but a specific intent to commit that act without the consent of the victim. [Citations.]" (*Dillon*, at p. 1378.) CALCRIM No. 890 did not specifically address this element but "specified that a required element of the assault offense was that the defendant intended to commit the crime of penetration of the genital opening of another by a foreign object." (*Id.* at p. 1379.) As in this case, the instruction referred the jury to the instruction which defined that crime, CALCRIM No. 1045, which "in turn, specifies that the complainant's lack of consent is a necessary element of the crime of penetration of the genital opening of another by force. A reasonable juror reviewing CALCRIM No. 1045, as instructed by CALCRIM No. 890, would conclude that unless he acted against the will or consent of the complainant, Hall could not have held the specific intent to commit the crime of penetration of the genital opening of another by force, and therefore could not be guilty of the lesser included assault offense as defined in CALCRIM No. 890." (*Ibid.*, fn. omitted.)

The defense in *Dillon* also argued that because CALCRIM No. 1045 does not define the intent requirement for forcible sexual penetration, "the jury would be unable to determine from looking at CALCRIM No. 1045 whether the defendant had the intent to commit that offense when he performed the act constituting the assault." (*Dillon*, *supra*, 174 Cal.App.4th at p. 1380.) The *Dillon* court found that forcible sexual penetration was a general intent crime, the mental state for that crime was not the specific intent to commit it, and, relying on CALCRIM No. 1045, "jurors would reasonably conclude that if the prosecution failed to prove the complainant's lack of consent, the defendant could not be guilty of assault with intent to commit forcible sexual penetration." (*Ibid.*)

We begin our analysis of *Dillon* by noting one mistake in that decision, finding forcible sexual penetration is a general intent crime. As a panel of this court has held, *Dillon* "construes the concept of 'specific intent' too narrowly." (*People v. Zarate-Castillo* (2016) 244 Cal.App.4th 1161, 1168.) The crime of forcible sexual penetration requires an intent to gain sexual gratification or arousal or to inflict abuse, which makes it a specific intent crime. (*Ibid.*)

Although *Dillon* is wrong on this point, the mistake does not mean it reached the wrong result or that it cannot inform us here. It correctly finds that CALCRIM Nos. 1045 and 890 must be read together, and that they require the jury to find a lack of consent from the victim in order to convict a defendant under section 220. While *Dillon* did not address whether these instructions required the jury to find defendant also had an intent to commit the act without the victim's consent, it noted this was an element of the crime and found the two CALCRIM instructions appropriately instructed the jury on section 220. We take the next logical step and find these

two instructions also require the jury to find defendant intended to commit the act without M.D.'s consent. CALCRIM No. 890 instructs the jury that one element of section 220 is that the defendant intended to commit sexual penetration by force, as defined in section 220. The jury was also instructed with CALCRIM No. 252 that forcible sexual penetration and any lesser included offense was a specific intent crime requiring a "specific intent and/or mental state" and that "[t]he act and the specific intent and/or mental state required are explained in the instruction or allegation." A reasonable juror therefore would understand that defendant could not be convicted under section 220 unless he specifically intended to commit the section 289 offense, as defined in CALCRIM No. 1045. Jurors would thus reasonably conclude that a conviction under section 220 required that it find defendant specifically intend to commit every element of section 289, which includes an intent that the victim did not consent to the act.[3]

ECF No. 9-16 at 12-15. The claim was then raised in a petition for review before the California Supreme Court, ECF No. 9-17 at 2, and summarily denied, ECF No. 9-19.

The U.S. Supreme Court has held that errors of state law in jury instructions do not provide a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."). The only question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). In analyzing this question, "the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Id.* A federal habeas court must also accord great deference to the state court decision rejecting the claim. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (quoting *Yarborough v. Alvarado*, 541 U.S. 652,

---

[3][footnote four in original text] Defendant notes a federal district court granted habeas relief for Hall, the defendant in *Dillon*, finding that it was an unreasonable application of federal law (the due process right to be instructed on every element of an offense) to find the jury was adequately instructed on the element of intent to act without the complainant's consent. (*Hall v. Cullen* (N.D. Cal. July 29, 2010, No. C 09-5299 PJH) 2010 U.S. Dist. LEXIS, 89946 at *50.) We are not bound by decisions from the Ninth Circuit Court of Appeals, (*People v. Williams* (1997) 16 Cal.4th 153, 190, 66 Cal. Rptr. 2d 123, 940 P.2d 710), and even less so by an unpublished decision from a United States District Court, and, finally, we are also not persuaded by it.

1    664 (2004)) (internal quotation marks omitted).  It is not sufficient that the state court's decision

2    is wrong; the petitioner must show that "the state court's decision is so obviously wrong that its

3    error lies beyond any possibility for fairminded disagreement."  *See Shinn v. Kayer*, 592 U.S. 111,

4    118 (2020).

5             As an initial matter, petitioner argues that this court should review his instructional error

6    claim *de novo*, because the state appellate court applied the incorrect standard.  ECF No. 1 at 39-

7    40.  He notes that the state court asked "whether it is reasonably likely that the instructions as a

8    whole caused the jury to misapply the law."  This standard applies to ambiguous instructions but

9    not to ones that were obviously erroneous.  *Id.* at 40.  In *Boyde v. California*, the Supreme Court

10   held that, where an instruction was ambiguous, "the proper inquiry in such a case is whether there

11   is a reasonable likelihood that the jury has applied the challenged instruction in a way that

12   prevents the consideration of constitutionally relevant evidence."  494 U.S. 370, 380 (1990).  By

13   contrast, where an instruction is unambiguously wrong, it is subject to the harmless error analysis.

14   *See Neder v. United States*, 527 U.S. 1, 15 (1999) ("Having concluded that the omission of an

15   element is an error that is subject to harmless-error analysis, the question remains whether

16   Neder's conviction can stand because the error was harmless.").  That analysis dictates that,

17   "before a federal constitutional error can be held harmless, the court must be able to declare a

18   belief that it was harmless beyond a reasonable doubt."  *Chapman v. Cal.*, 386 U.S. 18, 24 (1967).

19            The next question, then, is whether the instructions at hand were unambiguously wrong.

20   In evaluating that question, the court looks not just to the erroneous instruction in isolation, but to

21   the instructions in their entirety.  *See Cupp*, 414 U.S. at 146-47 ("[A] single instruction to a jury

22   may not be judged in artificial isolation, but must be viewed in the context of the overall

23   charge.").  Here, the state appellate court, after looking at the instructions in their entirety,

24   reasonably concluded that there was no omission that violated petitioner's rights.

25            The jury was given several pertinent instructions:

26            Under CALCRIM 890, it was instructed that, to find petitioner guilty of assault with intent

27   to commit sexual penetration by force, the state had to prove the following:

28

13

1. The Defendant did an act that by its nature would directly and probably result in the application of force to a person;

2. The Defendant did that act willfully;

3. When the Defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;

4. When the Defendant acted, he had the present ability to apply force to a person; and

5. When the Defendant acted he intended to commit sexual penetration by force.

Someone commits an act "willfully" when he does it willingly or on purpose.

The terms "application of force" and "apply force" mean to touch in a harmful or offensive manner.  The slightest touching can be enough if it is done in a rude or angry way.  Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.

The touching can be done indirectly by causing an object to touch another person.

. . .

To decide whether the Defendant intended to commit sexual penetration by force, please refer to instruction 1045 which defines that crime.

ECF No. 9-2 at 274-76; ECF No. 9-11 at 230-31.

Under CALCRIM 1045, it was instructed that:

The defendant is charged in Counts 2 and 3 with sexual penetration by force in violation of Penal Code section 289.

To prove that the defendant is guilty of this crime, the People must prove that:

1.   The defendant committed an act of sexual penetration with another person;

2.   The penetration was accomplished by using a foreign object, or an unknown object;

3.   The other person did not consent to the act;

AND

14

4.  The defendant accomplished the act:

by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person.

Sexual penetration means penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal, or gratification.

A foreign object, substance, instrument, or device includes any part of the body except a sexual organ.  An unknown object includes any foreign object, substance, instrument, or device, or any part of the body, including a penis, if it is not known what object penetrated the opening.

Penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort.

In order to consent, a person must act freely and voluntarily and know the nature of the act.

Evidence that the defendant and the other person dated is not enough by itself to constitute consent.

An act is accomplished by force if a person uses enough physical force to overcome the other person's will.

*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.

Retribution is a form of payback or revenge.

Menace means a threat, statement, or act showing an intent to injure someone.

An act is accomplished by fear if the other person is actually and reasonably afraid.

The defendant is not guilty of forcible sexual penetration if he/[she] actually and reasonably believed that the woman consented to the sexual penetration and actually and reasonably believed that she consented throughout the act of sexual penetration.  However, if as a result of self-induced intoxication, the defendant believed the female was consenting, that belief would not thereby become either reasonable or in good faith unless from all the surrounding circumstances other than self-induced intoxication you should find that defendant's belief that the female was consenting was reasonable and in good faith.  The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented.  If the

15

1          People have not met this burden, you must find the defendant not
2          guilty.

3  ECF No. 9-2 at 273-74; ECF No. 9-11 at 226-28.  Finally, the jurors were given the following

4  instruction on intent:

5          The crimes and other allegations in this case require proof of the
        union, or joint operation, of act and wrongful intent.
6

7          The following crimes require general criminal intent: forcible rape
        charged in Count I, the lesser crime of simple assault, and the lesser
8          crime of false imprisonment.  For you to find a person guilty of
        these crimes, that person must not only commit the prohibited act,
9          but must do so with wrongful intent.  A person acts with wrongful
        intent when he intentionally does a prohibited act; however, it is not
10         required that he intend to break the law.  The act required is
        explained in the instruction for that crime or allegation.
11
        The following crimes require a specific intent and/or mental state:
12         forcible sexual penetration charged in Counts 2 and 3, conspiracy to
        commit threatening and dissuading a witness charged in Count 4,
13         threatening and dissuading a witness charged in Count 5,
        kidnapping charged in Count 6, and the lesser crime of assault with
14         intent to commit a forcible sexual offense.  For you to find a person
        guilty of these crimes or any lesser crime, that person must not only
15         intentionally commit the prohibited act, but must do so with a
        specific intent and/or mental state.  The act and the specific intent
16         and/or mental state required are explained in the instruction for that
        crime or allegation.

17 ECF No. 9-2 at 262; ECF No. 9-11 at 208-09.

18         The state court, reading these instructions together, concluded that there was no clear

19 error.  I cannot review the claim *de novo*.  To conclude that *de novo* review is warranted, I would

20 have to conclude that the state court's overall determination regarding the instruction was

21 incorrect.  Put another way, I could apply *de novo* review only if I found that the instruction was

22 erroneous, not ambiguous, and thus that the state court had applied the wrong standard.  But in

23 order to find that it was incorrect, I must reject the state court's determination of this claim in its

24 entirety—a determination to which I am required to give deference.  "We look to the last

25 reasoned decision that resolves the claim at issue in order to determine whether that claim was

26 adjudicated on the merits."  *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020).  That decision is

27 entitled to deference.  *Richter*, 562 U.S. at 103.

28

As to the sufficiency of the state court's holding, petitioner acknowledges the cross-referencing occurring between the three instructions cited above: that 890 directs the jurors toward 1045 to decide whether petitioner "intended to commit a sexual penetration by force," and that forcible sexual penetration and assault with intent to commit sexual penetration were, in a third provision (number 252), defined as specific intent crimes. ECF No. 1 at 43. He argues, however, that the failure of both 890 and 1045 to tell jurors that they must find that petitioner specifically intended to act without the victim's consent renders the appellate court's logic untenable. *Id.* at 43-44.

The state court's decision, laid out as follows in the simplest terms, is not so unreasonable that fair-minded jurists could not disagree as to whether it was correct:

First, petitioner was charged, in pertinent part, with two counts of forcible sexual penetration (§ 289, subd. (a)(1)) and acquitted of these charges. He was convicted, however, of a lesser included offense of assault with intent to commit sexual penetration (§ 220). Both crimes require a finding of specific intent.

Second, the instruction for assault with intent to commit sexual penetration did not specify that a required element was a finding that petitioner intended to penetrate the victim without her consent. It did, however, list as an element a finding that "when defendant acted, he intended to commit sexual penetration by force." ECF No. 9-2 at 275. The jurors are instructed to "refer" to 1045 in making this finding. *Id.* at 276. Jury instruction 1045 states that a required element of sexual penetration by force is that the victim did not consent to the penetration and further elaborates that "[t]he defendant is not guilty of forcible sexual penetration if he/[she] actually and reasonably believed that the woman consented to the sexual penetration and actually and reasonably believed that she consented throughout the act of sexual penetration." *Id.* at 273-74. Taken together, these instructions could reasonably be read for the following proposition: unless petitioner acted against the victim's consent, he could not be found to have the specific intent required to be guilty of assault with intent to commit sexual penetration by force.

From the foregoing provisions, the state court concludes that a juror would reasonably be expected to understand that he or she was required, under section 220, to find that petitioner had a

1   specific intent that the victim did not consent to petitioner's act.  The logical chain is not hard to

2   discern: 890 required that the act in question be done "willfully" or with purpose, and when

3   petitioner acted, he intended to commit sexual penetration by force.  That offense, which pursuant

4   to 220 the jury was informed was a crime of specific intent, requires a finding that the victim did

5   not consent, and that the offender did not reasonably believe he or she had the victim's consent.

6   Put together, a juror could reasonably conclude that, to find petitioner guilty of the lesser included

7   offense, he or she had to find that petitioner specifically intended to commit the elements of

8   sexual penetration by force, including a specific intent that the victim did not consent.

9          There is no federal requirement that a jury instruction actually use the words "specific

10  intent" in order to convey the required mental state.  *See United States v. Arambasich*, 597 F.2d

11  609, 612 (7th Cir. 1979) ("[T]here is no particular magic or salvation in using the word 'specific'

12  per se.  The important aspect is that the total term of 'specific intent' be defined and its

13  applicability to the case be made clear.  It is unnecessary to use the term 'specific intent' or to

14  give any particular form of instruction.") (citation and internal quotation marks omitted); *United

15  States v. S & Vee Cartage Co., Inc.*, 704 F.2d 914, 919 (6th Cir. 1983) ("A court may properly

16  instruct the jury about the necessary mens rea without resorting to the words 'specific intent' or

17  'general intent.'") (citations omitted); *United States v. Sehnal*, 930 F.2d 1420, 1427 (9th Cir.

18  1991) (holding that phrase "'[a]n act is done willfully if done voluntarily and intentionally with

19  the purpose of violating a known legal duty' is equivalent to an instruction requesting 'a specific

20  intent to do something the law forbids' or 'the specific intent not to do something the law requires

21  to be done'"); *United States v. Bailey*, 444 U.S. 394, 405 (1980) ("In a general sense, 'purpose'

22  corresponds loosely with the common-law concept of specific intent, while 'knowledge'

23  corresponds loosely with the concept of general intent.").  Here, the jury instructions for 890

24  stated that the jury had to find that the act at issue was done "willfully" and that "[s]omeone

25  commits an act 'willfully' when he does it willingly or on purpose."

26          Petitioner, obviously, disagrees.  He claims that "[n]o fairminded jurist reading the

27  instructions given to [petitioner's] jury could find that they put reasonable jurors on notice of the

28  nature and content of the omitted specific-intent element."  ECF No. 1 at 43.  But multiple courts

1    have already determined that the instructions *did* provide sufficient notice of the specific intent

2    requirement.  As noted by the appellate court in this case, a separate state court concluded that the

3    instructions were adequate in *People v. Dillon*, 174 Cal. App. 4th 1367, 95 Cal. Rptr. 3d 449

4    (2009).  Then, in *Bryson v. Rackley*, another court in this district also concluded that similar

5    instructions were, viewed through the lens of AEDPA, sufficient.  No. 2:11-cv-01641-JKS, 2012

6    U.S. Dist. LEXIS 148195, *40-46 (E.D. Cal. Oct. 12, 2012).  Finally, the fact that this case is

7    now before this district necessarily means that the California Supreme Court was unconvinced.

8    Taken together, however, these decisions indicate that this is precisely the type of issue that

9    fairminded jurists could disagree about.

10         I recognize that petitioner relies heavily on *Hall v. Cullen*, a decision, favorable to him,

11    from the Northern District.  No. C 09-5299 PJH, 2010 U.S. Dist. LEXIS 89946 (N.D. Jul. 29,

12    2010).  Notably, as reproduced in a foregoing footnote, the state appellate court rejected *Hall*'s

13    reasoning, correctly noting that the state court is not bound by Ninth Circuit authority.  In *Hall*,

14    the petitioner also argued that the instructions given, CALCRIM 890 and 1045, omitted the

15    element of specific intent for the crime of assault with intent to commit sexual penetration.  2010

16    U.S. Dist. LEXIS 89946, *41-42.  Unlike in this case, however, the relevant state court decision

17    in *Hall* conceded that "the mental state required for conviction of assault with intent to commit

18    forcible sexual penetration 'is not the same' as that required for forcible sexual penetration, a

19    general intent crime."  *Id.* at *42.  This mattered, because CALCRIM 1045, to which the jurors

20    were directed, defined the crime of sexual penetration and, thereby, invoked general, rather than

21    specific intent.  *Id.*  Faced with these circumstances, the *Hall* court credited the petitioner's

22    argument that, being so confusingly instructed, the jurors in his case would not have recognized

23    that a conviction for assault with intent to commit sexual penetration required a finding of

24    specific intent.

25         Unfortunately for petitioner, *Hall* does not avail him.  First, I am not persuaded that *Hall*

26    accorded the state decision the deference it was owed or, at least, would have been owed if

27    decided after *Richter*.  *Hall* was decided in 2010; *Richter* issued early the next year.  Recall that

28    *Richter* emphasized that "[u]nder § 2254(d), a habeas court must determine what arguments or

1    theories supported or, as here, could have supported, the state court's decision; and then it must

2    ask whether it is possible fairminded jurists could disagree that those arguments or theories are

3    inconsistent with the holding in a prior decision of this Court."  562 U.S. 86, 102 (2011).  It is

4    evident that the court in *Hall* struggled with the state court's relative dearth of analysis on the

5    pertinent issue.  *See Hall v. Cullen*, No. C 09-5299 PJH, 2010 U.S. Dist. LEXIS 89946, *42-43

6    (N.D. Cal. Jul. 29, 2010) ("Nevertheless, without much explanation, the state appellate court

7    implied that the instructions' failure to specify the specific intent required for assault with intent

8    to commit forcible sexual penetration was not error.").  Under *Richter*, the district court might

9    have found it more difficult to cast that finding aside, no matter how underdeveloped the analysis

10   undergirding it.  And, *Richter*'s possible influence aside, the analysis in *Hall* is scant.  With

11   respect to whether the instructions were erroneous or ambiguous, the *Hall* court simply stated:

12
13   > The court agrees with Hall that this issue is not simply one of an
     > ambiguous jury instruction.  Instead, unlike the lack of consent
     > element discussed above, neither CALCRIM 890 nor 1045 included
14   > the element of intent required for conviction of the lesser-included
     > offense, assault with the intent to commit forcible sexual
15   > penetration without the victim's consent.  Therefore, the
     > instructions were erroneous on these facts, and the 'reasonable
     > likelihood' standard employed for ambiguous jury instructions is
16   > not applicable.

17   *Id.* at *45-46.  It may be that the state court's finding that 890 and 1045 together adequately

18   instructed the jury on specific intent in Hall's case was unreasonable, but that decision, which was

19   owed deference under AEDPA, surely demanded, even prior to *Richter*, a more significant

20   analysis.

21       Second, the state court decision here is different from *Hall* in an important respect: it held

22   that the crime of forcible sexual penetration was also a specific intent crime.  ECF No. 9-16 at 14

23   ("We begin our analysis of *Dillon* by noting one mistake in that decision, finding forcible sexual

24   penetration is a general intent crime.  As a panel of this court has held, *Dillon* 'construes the

25   concept of 'specific intent' too narrowly.' (*People v. Zarate-Castillo* (2016) 244 Cal.App.4th

26   1161, 1168.).  The crime of forcible sexual penetration requires an intent to gain sexual

27   gratification or arousal or to inflict abuse, which makes it a specific intent crime. (*Ibid.*))."  Thus,

28   the jury in this case was not faced with the difficult task of navigating the interaction between

general and specific intent present in *Hall*. *See* 2010 U.S. Dist. LEXIS 89946, at *44 ("Hall argues that it was objectively unreasonable for the state court to find that a reasonable juror, not properly instructed regarding the specific intent but instead instructed that s/he was required to find general intent, would have somehow figured out the requisite intent.").

Given that there was no error, and that "juries are presumed to follow their instructions," *see Zafiro v. United States*, 506 U.S. 534, 540 (1993), I also find that any possible claim related to the prosecutor's closing arguments misleading the jury about their instructions is unavailing.

Accordingly, it is ORDERED that petitioner's motion for issuance, ECF No. 13, is DENIED.

Further, it is RECOMMENDED that the petition for writ of habeas corpus, ECF No. 1, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days of service of these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Any such document should be captioned "Objections to Magistrate Judge's Findings and Recommendations," and any response shall be served and filed within fourteen days of service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    October 23, 2025

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE